IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| EQUIPMENT RENTAL SOURCE, LLC, a Colorado Corporation;  Plaintiff,  vs.  WESTERN SURETY COMPANY, a South Dakota Corporation;  Defendant. | 4:15CV3061  MEMORANDUM AND ORDER |

This matter is before the Court on the Motion for Summary Judgment (Filing No. 28) submitted by Defendant Western Surety Company ("WSC"). For the reasons stated below, the Motion will be granted.

## BACKGROUND

Equipment Rental Source, LLC ("ERS") responded to each of WSC's numbered facts and set forth additional facts in response. (*See* ECF No. 31, Page ID 135-39.) The Court has considered the additional facts to the extent they are relevant. The following is a summary of the pertinent facts presented in the parties' briefs, supported by pinpoint citations to evidence in the record, according to NECivR 56.1[1] and Federal Rule of Civil Procedure 56.

---

[1] *See* NECivR 56.1(b)(1) (effective December 1, 2015):

The party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts. The response should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.

1

**The Project and the Parties' Contractual Relationships**

The Nebraska Department of Roads ("NDOR") owned a construction project affecting a certain stretch of Interstate 80 in Keith County, Nebraska (the "Project"). On August 17, 2010, the NDOR entered into a contract (the "Prime Contract") with Upper Plains Contracting, Inc. ("UPCI"). As part of its obligations under the Prime Contract, UPCI procured a payment bond from WSC, Bond No. 929507060 (the "Bond"), under which WSC agreed to pay claimants for labor performed and material, supplies, and equipment used or rented in the performance of the Prime Contract. In its capacity as prime contractor, UPCI engaged Paul Reed Construction ("PRC") as a subcontractor for certain work on the Project. On March 28, 2011, PRC subcontracted with Arcon to perform some of its work, related to concrete crushing, for the Project (the "Arcon Subcontract"). Arcon purchased and/or leased materials and/or equipment from vendors, including Intermountain Construction Equipment, Inc. ("ICE"), and Equipment Rental Source, LLC ("ERS"), to perform work on the Project. ERS claims that Arcon failed to pay all amounts due for the materials and equipment purchased and/or leased from them. Accordingly, on September 20, 2011, ERS submitted notice to WSC of its claim on the Bond in the amount of $102,672.11.

**The Arcon Action**

On January 27, 2012, PRC filed the case of *Paul Reed Construction & Supply, Inc., v. Arcon, Inc., and Granite Re, Inc.*, in the District Court of Scotts Bluff County, Nebraska; Case No. CI12-56. PRC sought a declaratory judgment on certain aspects of the Arcon Subcontract as well as damages for breach of the Arcon Subcontract. On February 3, 2012, Arcon removed that action to this Court, captioned as *Paul Reed*

2

*Constr. & Supply, Inc. v. Arcon, Inc.*, 8:12-cv-00048-LSC-FG3 (the "Arcon Action"). That same day, Arcon filed a Counterclaim against PRC, alleging that PRC breached the Arcon Subcontract by "fail[ing] to pay Arcon for the labor, equipment[,] and materials Arcon and Arcon's subcontractors and suppliers performed or supplied on the Project." (Arcon Action, ECF No. 2, Page ID 24.) Arcon also filed a Third-Party Complaint against WSC on the Bond, seeking payment for its work on the Project, including payment for equipment that ERS supplied. On September 16, 2014, ERS filed a Motion to Intervene in the Arcon Action, proposing to assert a claim on the Bond against WSC for $102,672.11, due to Arcon's alleged failure to pay. On September 26, 2014, the Court denied ERS's Motion to Intervene.

On October 21, 22, 23, and 28, 2014, the Court conducted a jury trial in the Arcon Action. On October 30, 2014, the jury returned a verdict in PRC's favor and against Arcon on PRC's breach of contract claim; in PRC's favor and against Arcon on Arcon's breach of contract claim; and in Arcon's favor and against WSC on Arcon's claim against the Bond. (Arcon Action, ECF Nos. 174, 176.) The jury awarded PRC $14,000.00 on its breach of contract claim against Arcon, and awarded Arcon $13,438.26 on its breach of payment bond claim against WSC. (*See* Arcon Action, ECF No. 200, Page ID 2341-42.) On December 22, 2014, the Court determined that Judgment would be entered in PRC's favor and against Arcon in the amount of net $561.74, because the jury's verdict indicated that it intended the $13,438.26 as an offset in the amount owed by Arcon to PRC. (Arcon Action, ECF No. 201.)

**ERS's Claims in this Case**

On October 15, 2014, ERS initiated a lawsuit in the District Court of Douglas County, Nebraska. (ECF No. 1-2.) ERS asserted a claim on the Bond against WSC for $102,672.11 for amounts Arcon failed to pay. (*Id.*, Page ID 4-5.) ERS also asserted a claim against Arcon for breach of the Rental Agreement for that same amount. (*Id.*, Page ID 10.) Finally, ERS asserted a breach of contract claim against PRC, alleging PRC breached the Arcon Subcontract by failing to have Arcon obtain a separate payment bond for the benefit of ERS. (*Id.*, Page ID 11.) On or about October 15, 2014, ERS amended its Complaint, adding Arcon's principal, Donna Schultejann ("Schultejann"), as a defendant and asserting a claim against her for breach of a personal guarantee that purported to secure Arcon's obligations to ERS.

On or about November 21, 2014, Arcon, Schultejann, and ERS entered into a Settlement Agreement and Mutual Release (the "Settlement Agreement") with respect to the claims "arising out of the Project which include breach of contract for unpaid material and equipment rental and under the Personal Guarantee and questioning the accuracy of amounts outstanding on the Sale-Invoice/Rental Agreements" (ECF No. 29-3, Page ID 121-22.) Under the terms of the Settlement Agreement, ERS agreed "to accept the amount of Sixty-Five Thousand and no/100 Dollars ($65,000.00) as a full and complete settlement of any and all claims held by ERS against Arcon and/or Schultejann in connection with the Project" (*Id.*, Page ID 122.) As part of the Settlement Agreement, ERS executed an Assignment of Claims (the "Assignment") in favor of Arcon with respect to ERS's "right, title[,] and interest in and to its claim as a supplier of

[Arcon] against Western Surety Company" on the Bond with respect to its furnishing equipment for the Project. (ECF No. 29-4, Page ID 125.)

On April 30, 2015, ERS filed a Second Amended Complaint, asserting only a claim on the Bond against WSC (the "ERS Action"). (ECF No. 1-4.) ERS omitted its claims against Arcon, Schultejann, and PRC. On May 29, 2015, WSC removed the ERS Action to this Court.

**STANDARD OF REVIEW**

"Summary judgment is appropriate when, construing the evidence most favorably to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Crozier v. Wint,* 736 F.3d 1134, 1136 (8th Cir. 2013) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is not disfavored and is designed for every action." *Briscoe v. Cnty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (internal quotation marks omitted) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) *cert. denied*, 132 S. Ct. 513 (2011)).  In reviewing a motion for summary judgment, the Court will view "all facts and mak[e] all reasonable inferences favorable to the nonmovant." *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.,* 703 F.3d 1104, 1107 (8th Cir. 2013).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* at 325. Instead, "the burden on the moving party may be discharged by 'showing' . . . that there

5

is an absence of evidence to support the nonmoving party's case." *Id.* (quoting Fed. R. Civ. P. 56(c)).

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Briscoe,* 690 F.3d at 1011 (internal quotation marks omitted) (quoting *Torgerson*, 643 F.3d at 1042). "[T]he mere existence of some alleged factual dispute between the parties" will not defeat an otherwise properly supported motion for summary judgment. *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011) (internal quotation marks omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 972 (8th Cir. 2012) (internal quotation marks omitted) (quoting *Torgerson*, 643 F.3d at 1042). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue for trial" and summary judgment is appropriate. *Torgerson*, 643 F.3d at 1042 (internal quotation marks omitted) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

## DISCUSSION

WSC argues that it is entitled to summary judgment on two principal grounds. First, it argues that ERS lacks standing to pursue the claims alleged against WSC. Second, WSC argues that ERS's claims are barred under Nebraska's "Little Miller Act," Neb. Rev. Stat. §§ 52-118, 52-118.01 (Reissue 2010). The Court concludes that ERS has standing to pursue its claims, but lacks a contractual relationship with a prime contractor or subcontractor on the Project, and its claims are barred under Nebraska's Little Miller Act.

**ERS's Standing**

WSC argues that ERS lacks standing because it assigned its rights under the Bond to Arcon as part of the Settlement Agreement. "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Am. Farm Bureau Fed'n v. U.S. Envtl. Prot. Agency*, No. 15-1234, 2016 WL 4709117, at *3 (8th Cir. Sept. 9, 2016) (citing U.S. Const. art. III, § 2). Standing "is a "jurisdictional prerequisite" and thus "a threshold issue that we are obligated to scrutinize," *sua sponte* if need be. *Bernbeck v. Gale*, 829 F.3d 643, 646 (8th Cir. 2016) (quoting *Curtis Lumber Co. v. La. Pac. Corp.*, 618 F.3d 762, 770 & n.2 (8th Cir. 2010)). "A plaintiff establishes standing by showing that he has suffered an injury in fact that is fairly traceable to the challenged conduct of the defendant and that will likely be redressed by a favorable decision." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In addition to constitutional standing, plaintiffs must satisfy the prudential requirement that "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to

relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

WSC does not assert that ERS lacked standing to bring this action. Rather, WSC argues that ERS had standing but lost it when ERS settled with Arcon and assigned ERS's claims against WSC to Arcon. WSC's argument is inapposite "[b]ecause standing is determined as of the lawsuit's commencement," and, for purposes of its standing analysis, the Court considers "the facts as they existed at that time." *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000). There is no dispute that ERS had standing to pursue this claim at the time it commenced the lawsuit. Further, the Federal Rules of Civil Procedure expressly provide that "[i]f an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." Fed. R. Civ. P. 25(c). Thus, because ERS had standing at the time the action was commenced, this action may continue in the name of ERS and dismissal on for lack of standing is not appropriate. WSC has not moved to substitute Arcon as the plaintiff, and the Court will not do so at this time.

**ERS's Status Under the Little Miller Act**

Although ERS has standing in this case, its claim falls outside the protection of the Little Miller Act. Under Nebraska's Little Miller Act, "[e]very person who has furnished labor or material . . . and who has not been paid in full . . . shall have the right to sue" on a bond obtained by a general contractor. Neb. Rev. Stat. § 52-118.01. The statute "provides protection to materialmen and laborers in the construction or repair of public construction projects when the provisions of the general mechanic's lien laws do

not apply." *Gerhold Concrete Co. v. St. Paul Fire & Marine Ins. Co.*, 695 N.W.2d 665, 670 (Neb. 2005) (citing *Dukane Corp. v. Sides Constr. Co.,* 302 N.W.2d 721 (Neb. 1981)). Nebraska's Little Miller Act is "highly remedial in [its] nature" and "should be given a liberal construction and application in order to give effect to the intention of the Legislature to protect those whose labor and materials become a part of public projects." *McElhose v. Universal Sur. Co.*, 158 N.W.2d 228, 235 (Neb. 1968). However, the statute's reach is not unlimited, and to recover on a bond, a claimant must have a relationship with the prime contractor or, under certain circumstances, a subcontractor. *See* Neb. Rev. Stat. § 52-118.01 ("Any person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing such bond or bonds shall have a right of action upon the bond or bonds upon giving written notice to the contractor . . . .") . The Nebraska Supreme Court, citing the United States Supreme Court's interpretation of the Federal Miller Act, 40 U.S.C. § 3133, explained that:

> [T]he right to bring suit on a payment bond is limited to (1) those materialmen, laborers and subcontractors who deal directly with the prime contractor and (2) those materialmen, laborers and subcontractors who, lacking express or implied contractual relationship with the prime contractor, have direct contractual relationship with a subcontractor and who give the statutory notice of their claims to the prime contractor.

*McElhose*, 158 N.W.2d at 234 (quoting *Clifford F. MacEvoy Co. v. U.S. for Use & Benefit of Calvin Tomkins Co.*, 322 U.S. 102, 107-08 (1944)).

ERS did not deal directly with the prime contractor, UCPI. Thus, to sustain its claim, ERS must have had a direct contractual relationship with a subcontractor and given statutory notice of its claims to UPCI. ERS's work on the Project was based

9

solely on its contractual relationship with Arcon. Accordingly, to sustain a claim against the Bond, Arcon must be a "subcontractor" within the meaning of Nebraska's Little Miller Act.

The Nebraska Supreme Court addressed the meaning of "subcontractor" under the Little Miller Act in *McElhose*. In *McElhose*, the State of Nebraska contracted with Blacktop, a prime contractor, to perform the surfacing of a road project. *McElhose*, 158 N.W.2d at 231. Blacktop, in turn, contracted with John Calcavechia ("Calcavechia") to furnish gravel for the project. *Id*. To fulfill his promise to produce gravel, Calcavechia rented two tractors from the plaintiff, McElhose. *Id*. McElhose eventually made a claim on the statutory payment bond that Blacktop procured. *Id*. The issue before the Nebraska Supreme Court was whether McElhose's contract with Calcavechia was "a contract with a subcontractor within the provisions of [Neb. Rev. Stat. § 52-118.01], or whether or not the delivery of the gravel was the supplying of material, . . . and not within the contemplation of the statute." *Id*. at 233.

The trial court concluded that Calcavechia was a subcontractor under § 52-118.01. The Nebraska Supreme Court agreed, noting that "[w]hether or not a plaintiff is dealing with a subcontractor or a materialman, as those terms are used in the act, involves a question of fact." *Id.* at 235. The court defined a subcontractor as:

> [O]ne who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, giving consideration to the substantiality and importance of the relationship between the prime contractor and the alleged subcontractor, the relative importance of the work and materials to the prime contract, and the nature of the materials supplied as an integral part of the project.

*Id.* The court reasoned that Calcavechia's contract to supply a large quantity of gravel "was a daily necessity under the prime contract and, as such, was furnished in prosecution of the work provided for in the prime contract." *Id.* Thus, under the circumstances, Calcavechia's contract "was an assumption of a specific part of the material requirements of the prime contractor." *Id.*

ERS asserts that, like Calcavechia, Arcon was a subcontractor. Thus, according to ERS, ERS's contract with Arcon was similar to the contract between McElhose and Calcavechia. Although a party's status as a subcontractor "involves a question of fact," ERS's contractual position in this case in relation to the Bond is distinguishable as a matter of law from the position of the plaintiff in *McElhose*. In *McElhose*, the State of Nebraska contracted with Blacktop, who contracted with Calcavechia, who then contracted with McElhose. In this case, The State of Nebraska contracted with UPCI, who contracted with PRC, who contracted with Arcon, who then contracted with ERS. Thus, the relative positions of the parties in each case based on their direct contractual relationships are depicted as follows:



| *McElhose:* | *This Case:* |
|:---:|:---:|
| State of Nebraska | State of Nebraska |
| ↓ | ↓ |
| Blacktop | UPCI |
| ↓ | ↓ |
| Calcavechia | PRC |
| ↓ | ↓ |
| McElhose | Arcon |
| | ↓ |
| | ERS |

Based on its contractual position, Arcon, and not ERS, occupies the position of the plaintiff in *McElhose*. Thus, while Arcon could pursue a claim on the Bond because it

11

had a contract with PRC, a subcontractor, it does not automatically follow that ERS could also pursue a claim on the Bond.

The Nebraska Supreme Court did not directly address in *McElhose* whether a party in a contractual position similar to ERS may pursue a claim on a bond, nor is the Court aware of any other Nebraska case addressing this issue. "[B]ecause the Nebraska Supreme Court has not yet spoken on this issue, [the Court] must attempt to predict what that court would decide if [the Nebraska Supreme Court] were to address the issue." *Lindsay Mfg. Co. v. Hartford Acc. & Indem. Co.*, 118 F.3d 1263, 1267-68 (8th Cir. 1997). In making its prediction, the Court "may consider relevant state precedent, analogous decisions, considered dicta, and any other reliable data." *Id.* (citation omitted). When interpreting the Little Miller Act, the Nebraska Supreme Court has held that "[t]he purpose and language of § 52–118.01 are the same as in the [federal] Miller Act." *Gerhold*, 695 N.W.2d at 671. In both *Gerhold* and *McElhose*, the Nebraska Supreme Court relied on cases interpreting the federal Miller Act to interpret Nebraska's Little Miller Act. *See Gerhold*, 695 N.W.2d at 671 (citing *United States v. Hesselden Construction Co.*, 404 F.2d 774 (10th Cir. 1968) (additional citations omitted); *McElhose*, 158 N.W.2d at 234 (citing *MacEvoy Co.*, 322 U.S. at 107-08). Accordingly, the Court looks to cases interpreting the federal Miller Act to determine whether ERS can sustain a claim against the Bond.

Similar to Nebraska's Little Miller Act, the federal Miller Act "was designed to provide an alternative remedy to the mechanics' liens ordinarily available on private construction projects." *J.W. Bateson Co. v. U.S. ex rel. Bd. of Trustees of Nat. Automatic Sprinkler Indus. Pension Fund*, 434 U.S. 586, 589 (1978). "Because 'a lien

cannot attach to Government property,' persons supplying labor or materials on a federal construction project were to be protected by a payment bond." *Id.* (quoting *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 121-22 (1974)). Using wording essentially identical to § 52-118.01, the federal Miller Act's protection is limited and requires "that persons who lack a 'contractual relationship express or implied with the [prime] contractor' show a 'direct contractual relationship with a subcontractor' in order to recover on the bond." *Id.* (quoting 40 U.S.C. § 3133(b)(2)).

As in *McElhose*, the issue before the Supreme Court in *J.W. Bateson* was whether a particular party was a subcontractor for purposes of making a claim on a payment bond. In *J.W. Bateson*, the United States contracted with J.W. Bateson Co., the prime contractor, for construction of an addition to a hospital and J.W. Bateson Co. provided a payment bond. 434 U.S. at 587. J.W. Bateson Co. subcontracted with Pierce Associates for a portion of the original work, and Pierce Associates in turn contracted with Colquitt Sprinkler Co. ("Colquitt") for the installation of a sprinkler system in the hospital addition. *Id.* Under a collective bargaining agreement, Colquitt was required to pay over certain amounts withheld from union employees to benefits programs for the employees. *Id.*

After Colquitt failed to make any of the payments, the union representing the employees notified J.W. Bateson Co. of the amount the employees claimed due on the bond, and sued J.W. Bateson Co. in the name of the United States. *Id.* at 587-88. The Court of Appeals for the District of Columbia Circuit concluded that Colquitt was "technically a sub-subcontractor" because its direct contractual relationship was with Pierce Associates and not J.W. Bateson Co. *Id.* at 588. However, the D.C. Circuit

13

nevertheless treated Colquitt as a "subcontractor" for purposes of the Miller Act because its work on the jobsite was an "integral and significant part of . . . the contract." *Id*. Thus, the D.C. Circuit permitted Colquitt's employees to recover under the payment bond. *Id*.

The Supreme Court reversed the D.C. Circuit, concluding that, for purposes of the Miller Act, "a contract with a prime contractor is a prerequisite to being a 'subcontractor.'" *Id.* at 590. The Court noted that "Colquitt's employees enjoyed no contractual relationship, express or implied," with J.W. Bateson Co., but "that they did have a direct contractual relationship with Colquitt." *Id.* (internal marks omitted). Thus, the question before the Court was whether "whether Colquitt can be considered a 'subcontractor.'" *Id*. The Court defined subcontractor as "one who *performs for and takes from the prime contractor* a specific part of the labor or material requirements of the original contract . . . ." *Id.* (quoting *MacEvoy Co.*, 322 U.S. at 109) (emphasis in original). Looking to the Miller Act's legislative history, the Court noted that the Committee Reports of both the Senate and the House of Representatives directly addressed "the question at issue here: 'A sub-subcontractor may avail himself of the protection of the bond by giving written notice to the contractor, but that is as far as the bill goes. It is not felt that more remote relationships ought to come within the purview of the bond.'" *Id.* at 591 (quoting H.R. Rep. No. 1263, 74th Cong., 1st Sess., 3 (1935); S. Rep. No. 1238, 74th Cong., 1st Sess., 2 (1935)). The Court concluded, therefore, that "Congress understood the difference between 'sub-subcontractors' like Colquitt and 'subcontractors' like Pierce [Associates], and that it intended the scope of protection of a payment bond to extend no further than to sub-subcontractors." *Id.* (citing *MacEvoy*, 322 U.S., at 107-08).

Based on the reasoning in *J.W. Bateson*, it appears the Nebraska Supreme Court would conclude ERS is too far removed from the prime contractor and subcontractor to recover on the Bond. In *McElhose*, the Nebraska Supreme Court relied on the same definition of "subcontractor" used by the Court in *J.W. Bateson*. *See J.W. Bateson*, 434 U.S. at 590; *McElhose*, 158 N.W.2d at 235. The Nebraska Supreme Court held that McElhose could make a claim on the payment bond because it had a direct contractual relationship with Calcavechia, a subcontractor. In contrast, "while Colquitt could have claimed against the payment bond had Pierce defaulted in its obligations, the employees of Colquitt were not similarly protected against Colquitt's default, because they did not have a contractual relationship with Pierce or any other 'subcontractor.'" *J. W. Bateson*, 434 U.S. at 591-92.

The undisputed evidence shows that although PRC was a subcontractor, under the Supreme Court's reasoning in *J.W. Bateson*, Arcon was a sub-subcontractor. Therefore, in relation to the Bond in this case, ERS is similarly situated with the employee plaintiffs in *J.W. Bateson*, rather than the plaintiff in *McElhose*:



| *McElhose:* | *J.W. Bateson:* | *This Case:* |
|:---:|:---:|:---:|
| State of Nebraska | United States | State of Nebraska |
| ↓ | ↓ | ↓ |
| Blacktop | J.W. Bateson Co. | UPCI |
| ↓ | ↓ | ↓ |
| Calcavechia | Pierce Associates | PRC |
| ↓ | ↓ | ↓ |
| McElhose | Colquitt | Arcon |
|  | ↓ | ↓ |
|  | Union Employees | ERS |

ERS, having no direct contractual relationship with PRC or UPCI, falls outside the scope of protection offered by the Little Miller Act. While the Court recognizes that other state

courts interpreting language based on the federal Miller Act have reached different conclusions,[2] ERS has cited no authority suggesting that the Nebraska Supreme Court would interpret the language in Nebraska's Little Miller Act in a manner inconsistent with the United States Supreme Court's interpretation of the federal Miller Act. Accordingly, the Court concludes ERS is too far removed from the prime contractor and subcontractor to pursue a claim against the Bond in this case.

**<u>Scope of the Bond Language</u>**

ERS contends that even if it cannot collect under the Little Miller Act, it can nevertheless collect under the broader language of the Bond itself. In relevant part, the Bond states:

> [T]hat it is given to secure and does secure also the payment by the said bounden UPPER PLAINS CONTRACTING, INC. of all overpayments made to said principal by the Department of Roads, and of all just claims to all laborers and mechanics for labor that shall be performed, and for the payment of all material, supplies and equipment which is used or rented in performing the contract . . . .

(ECF No. 1-4, Page ID 29.) ERS argues that because the Bond includes coverage for payment of "all just claims to all laborers and mechanics for labor that shall be performed, and for the payment of all material, supplies and equipment which is used or rented in performing the contract," and makes no specific reference to the Little Miller

---

[2] *See State ex rel. W.M. Carroll & Co. v. K.L. House Const. Co., Inc.*, 656 P.2d 236 (N.M. 1982) ("[I]n the absence of any indication of a contrary intent on the part of the state Legislature, we hold that the [New Mexico] Little Miller Act shall apply to suppliers of materials under any subcontract involving a state construction project. We recognize that the federal cases are contrary, but those cases rely on legislative history which is inapplicable to the New Mexico statute."); *Richards and Conover Steel Co. v. Nielsons, Inc.*, 755 P.2d 644 (Okla. 1988) (concluding that although the Oklahoma Little Miller Act and the federal Miller Act contained identical wording, there was "no affirmative showing there was intent to adopt the federal act in part."); *Peters v. Hartford Acc. and Indent. Co.,* 389 N.E.2d 63 (Mass. 1979) (holding that *J.W. Bateson Co.* did not control the Massachusetts Little Miller Act because no state legislative history supported the Supreme Court's interpretation); *Tom Barrow Co. v. St. Paul Fire & Marine Ins. Co.*, 421 S.E. 2d 85 (Ga. App. 1992) ("[T]he Supreme Court decision construing the Miller Act is not only not persuasive authority but is no authority at all as applicable to the Georgia statute insofar as it holds that a subcontractor is limited to those having privity with the main contractor.").

Act, the express language of the Bond controls and the limitation applicable to remote claims does not apply.

Some state courts have suggested that the language of a bond can afford greater protection than a statute mandating the bond. *See Wichita Sheet Metal Supply, Inc. v. Dahlstrom & Ferrell Const. Co.*, 792 P.2d 1043, 1046 (Kan. 1990) ("If the bond provides greater protection than is required by the statute, then the language of the bond is controlling.");[3] *Am. Trust & Sav. Bank v. U.S. Fid. & Guar. Co.*, 418 N.W.2d 853, 855 (Iowa 1988) ("If the bond provides more coverage than the statute requires, this additional coverage would be for the benefit of the bank."). Yet this Court is not persuaded that the Nebraska Supreme Court would permit ERS's claim based on the language of the Bond. As noted above, the Nebraska Supreme Court relies on interpretations of the federal Miller Act to interpret Nebraska's Little Miller Act. In *United States ex rel. Sherman v. Carter*, 353 U.S. 210 (1957), the bond at issue insured "prompt payment to all persons supplying labor and material in the prosecution of the work provided for in said contract." *Id.* at 216. Despite this broad language, the United States Supreme Court held that the "bond involved [in *Sherman*] was furnished to meet the statutory requirements of the Act and appears, on its face, to comply with these requirements. There is no indication that the coverage of the bond was intended to exceed them." *Id.* at 216.

---

[3] The Kansas Supreme Court in *Wichita Sheet Metal* concluded that, based on language similar to Nebraska's Little Miller Act, the claimants were suppliers to a sub-subcontractor. "As such they are not in privity with the owner, contractor, or subcontractor to the contractor and have no lien rights. They, therefore, are afforded no protection under the public works bond herein." *Wichita Sheet Metal*, 246 Kan. at 564.

The Bond in this case contains language nearly identical to the language in the bond at issue in *Sherman,* and there is no material dispute that UPCI procured the Bond to comply with the statutory requirements of Nebraska's Little Miller Act. The Nebraska Supreme Court has interpreted bonds required in other statutory contexts to be read in light of the statute controlling the bond. *See Sun Ins. Co. of N.Y. v. Aetna Ins. Co. of Hartford, Conn.*, 98 N.W.2d 692, 702 (Neb. 1959) (citation omitted) (concluding that "statutory bond will be construed in the light of the purpose for which it is required as expressed in the statute"). "The law at the time of the execution of a statutory bond is a part of it; if it gives to the bond a certain legal effect, it is as much a part of the bond as if in terms incorporated therein." *Sun Ins. Co.*, 98 N.W.2d at 702. In *Sun Ins. Co.*, the Nebraska Supreme Court specifically stated:

> Where a bond is given under the authority of a statute in force when it is executed, in the absence of anything appearing to show a different intention it will be presumed that the intention of the parties was to execute such a bond as the law required, and such statute constitutes a part of the bond as if incorporated in it, and the bond must be construed in connection with the statute.

*Id.* Just as in *Sherman*, there is no indication that the language of the Bond was intended to exceed the scope of the Little Miller Act. Although the Bond does not specifically reference § 52-118 or § 52-118.01, the language of the Bond is nearly identical to the statute, and the Bond was procured to satisfy the requirements of the Little Miller Act. Accordingly, the limitations of the statute are incorporated into the Bond and, for the reasons stated above, ERS's claims cannot proceed.

**Conclusion**

Although ERS has standing to proceed in this case, its contractual relationship with Arcon is too far removed from the prime contractor and subcontractor to permit recovery on the WSC Bond. Further, because the Bond must be read in conjunction with Nebraska's Little Miller Act, ERS cannot proceed solely on the language of the Bond. Accordingly, ERS's claims against the Bond will be dismissed.

IT IS ORDERED:

1. Defendant Western Surety Company's Motion for Summary Judgment (Filing No. 28), is granted;

2. Plaintiff Equipment Rental Source, LLC's claims against Defendant Western Surety Company, are dismissed, with prejudice; and

3. A separate judgment will be entered.

Dated this 12th day of October, 2016.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge